United States Court of Appeals for the 4th Circuit The second case is 22-4609, United States v. Price, Mr. Glaeser May it please the Court, William Glaeser for the United States. The most straightforward way to resolve this case is to hold that firearms with removed, obliterated, or altered serial numbers are not in common use for lawful purposes like self-defense. Well, let's go back to an even earlier step. Under Bruin, we look at the plain text of the Second Amendment. So tell me the government's position on whether the defendant here is part of the people. Your Honor, because he is a felon, the government's view is that he is not part of the people. However, I don't think that's primarily relevant for purposes of 922K. No, it would be for him. Your Honor, it would be. We've made the argument that he can't actually show the facial invalidity of the statute. That sort of relates to the 922G1 issue in which the district court ruled in our favor. So we don't think we have to sort of win on the people argument in order for the court to rule in our favor. If in this case, since Mr. Price is a twice convicted violent felon, if he's not part of the people, he's not part of the political community, doesn't that end the cases to him? Your Honor, yes, that is our view, but that's, I don't think that's the sort of primary point of view. Other searches have gone another way, I'm not sure they're right, but that to me seems like it's the first step before we get to anything else. Your Honor, this court could certainly conclude that for that reason alone, he cannot show the facial invalidity of the statute because it would be constitutional and has applied to him. But with respect to section 922K and its prohibition that applies generally on the possession of firearms with obliterated, removed, or altered serial numbers, the most straightforward way for this court to resolve the issue, whether it's a matter of text, the first step of ruin, whether it's a matter of history, the Supreme Court has said that firearms that are not in common use are simply not protected by the Second Amendment. Again, we could debate whether that's a matter of text or a matter of history, but the Supreme Court has said that, and that's binding on this court, and so the only question that this court needs to resolve is whether or not firearms, the possession of firearms with removed, obliterated, or altered serial numbers, whether those firearms are in common use. Well, the defendant says that's not the proper way to frame it. The defendant says, you look at the actual weapon, here I think was a .25 caliber pistol. You determine that's, whether or not that's in common use before you get to a question of obliteration. Your Honor, I don't think that there's any basis in the Supreme Court's decisions for sort of parsing it out in that way. So it is true that I think there's agreement between the parties that the presence or absence of a serial number or the presence of an obliterated serial number doesn't actually affect the functioning of the firearm, but the Supreme Court didn't limit the in common use test simply to functional characteristics of the firearm, and for reasons that we've set forth, there is simply no reason to believe that firearms with obliterated serial numbers are in common use. And I think it is important to look at the specific type of firearms. They're all used by criminals. That's correct, Your Honor. As a general proposition. As a general proposition, that's absolutely correct. And again, I think that the reason that we can't simply just look at sort of the firearm in the absence of the obliterated serial number is that the presence of that obliterated serial number, altered or removed serial number, is actually an element of the offense. So we can't just say, oh, we're just talking about possession sort of in general, because possession in general, I think we agree, is protected by the Second Amendment. I'm playing the devil's advocate with that argument. Let's say there's a hypothetical statute with this particular type of pistol, and that statute says that as long as they're colored orange, readily visible, that's legal. But if they're camo colored, so that it would be easy to hide, that's illegal. The function of the firearm has not changed. Would the same analysis apply there where it's simply a matter of color? Your Honor, I think that the analysis would be similar. It would still be a common use inquiry. I do think there would be a distinction if, for example, Congress were to legislate that firearms had to be orange. That would be essentially to make illegal the millions of firearms that are not orange and that are in common use today. So I think that that might implicate something different. But if, for example, there's some particularly unusual color of firearm, I think it might be difficult to conclude that that was in common use for purposes of self-defense. I guess the question's that Judge King, I'm here. Judge King is raising is a fundamental question that I have with the whole case as to whether serial number is simply a law enforcement device and really is not the regulation of the firearm itself. It's it's really not involved in keeping and bearing arms. It's it's it's a collateral law enforcement. At least this is what I'm wondering, whether it could be just a collateral law enforcement device in order to help the order and solving of misuse of firearms. So, Your Honor, it is true that that serial numbers are helpful for the purpose of solving crimes. I don't think that's how serial numbers originally came to be. They were actually they were put on firearms by many private manufacturers more than a century before they were required by the Gun Control Act of 1968. So they serve other useful purposes for the manufacturer and for the owners of the firearms to ensure that their firearms can be recovered, if stolen, to know the provenance of their firearms, etc. But why was the statute adopted that made the crime to file them off? It was it was for the very reason that Judge Neumeyer just suggested. It was to ensure that firearms that were used in crimes could be correct. It was a law enforcement purpose. To help find the crooks. That's correct, Your Honor. And and again, if we're looking at this from the sort of common use perspective, as we find out about the bankers, the assassin or something, you don't want a firearm with serial number. That's correct, Your Honor. The question remains is whether that is a Second Amendment aspect, something that's under the umbrella of the Second Amendment. In other words, true, it's attached to a firearm, but the nature of the firearm, the way it functions, whether it's useful, whether it's common, whether it's bearable, all those things are not implicated by the serial number. The serial number seems to be somewhat collateral. I don't know what a good analogy would be, but there's something intuitive to suggest that government can regulate firearms in order to assist law enforcement quite apart from the Second Amendment right to bear arms. Absolutely, Your Honor. And the government, to be clear, the government hasn't made the kind of argument that you're suggesting that simply isn't implicated here, I think. And the reason is that this is this is different, say, from a silencer or something else that can be attached to an arm but isn't actually itself part of the arm here. One of the elements of the offense is that there is a firearm on which the serial number is obliterated, and so the government can't prove the offense without proving that there's a possession of a firearm and a serial number is not something that's sort of entirely removed from or can be entirely removed from the firearm in the same sense that a silencer can. But again, it is odd because, as you point out, the removal of the serial number doesn't affect the functioning of the firearm. Let me ask you something about the sequencing of proofs. And the question is, do we, are we bound to decide the common use question prior to addressing historical limitations? And I was wondering if we had some flexibility with respect to that and whether one can assume arguendo that they might be in common use, but that the historical limitation is so clear. And so if that would resolve, I wonder if courts of appeals are permitted to pursue the most direct way of resolving the case. And I thought maybe the Seventh Circuit did something along those exact lines and proceed directly to, the Supreme Court's always given us a little bit of leeway on how we order sequences of proof and how we order the steps. And so I'm wondering if, and I think I'm interpreting the Seventh Circuit opinion correctly, but I'm wondering if it would be feasible in your view for a court of appeals to say the historical record and purpose is so clear that the limitation is permissible? Absolutely, Your Honor. The court could go that route if it preferred. And in fact, of the district courts that have considered Section 922 case constitutionality post-Bruin, there have been 14 district court decisions. Two of them did that exact thing. They assumed that this is a firearm that was in common use. I know that, what I'm saying is I don't think this court is in a straitjacket. Absolutely. As opposed to, and it would be, there are many, many cases which would seem to indicate that the court of appeals can proceed directly to what will dispose of the case because that's their job is to resolve cases. And one other thing that concerned me here is, you know, there's this aphorism about all roads lead to Rome. And in this case, there is a phalanx, a Roman phalanx of district court opinions barring the appellee's entrance into Rome. We, there must be, I can't count the number of district court opinions, which as an appellate judge, I still greatly respect, but they've upheld this almost uniformly. And what we had here was a single district court that varied from not just the consensus, but from an overwhelming consensus that other district courts all across the country did not want to start unraveling Section 922. Section 922, more than any other section of the U.S. Code, is probably essential to federal law enforcement. We all have, it prevents domestic violence, it prevents felons from being in the possession of a firearm, and we start knocking down Section 1922. Who's to know where that, where that's going to end? The next thing we'll have is a challenge to 922G. And so, you know, I can't hardly even begin to imagine the number of dominoes it could begin to fall. Yes, Your Honor, and there have been challenges to Section 922G1 and other provisions within 922G. How many district courts are there that agree with you? On 922K, Your Honor, there are 14 district court decisions that have agreed with us. And if I can, just to defend the district court. How many are consistent with this group? This is the only decision. I want to ask you a question. Have you ever heard of Icelander? Yes, Your Honor. You know what it stands for? It's been a long time, Your Honor. I've been to law school.  On a non-constitutional ground, we never go to the constitutional question. We only decide the constitutional issue as a last resort. Yes, Your Honor. So is there a non-constitutional ground here? Your Honor, I don't see a non-constitutional ground for reversing the district court's decision, finding a statute unconstitutional on space. I think the court does need to address the constitutionality of Section 922K, at least as applied to this defendant, and thereby by concluding that it's not facially invalid. If I can, to just briefly defend the district court, this was the first district court decision reaching 922K. We think it's wrong, but it was the first one to do it. Now, there have been 14 district courts, 13 district judges subsequently who have considered the constitutionality of 922K with the benefit of the district court decision below and unanimously disagreed with it. So the district court, we just think, got this wrong. And other district courts have recognized that. Can you go back to him and ask him to reconsider and vacate the thing? Your Honor, this court, I think the constitutional question is squarely before this court. And if the court doesn't decide it now, it will likely be deciding it in a different posture when a defendant whose motion to dismiss has been denied appeals. So I think the court might as well go ahead and decide it now. But if I can return to Judge Wilkinson's question about sort of the most straightforward way to resolve this case, there are at least two different ways the court can resolve it. One is to sort of look at our historical analogs and conclude that they're close enough that they satisfy Bruin. But another way is simply to conclude that firearms with obliterated, removed or altered serial serial numbers are not in common use for lawful purposes like self defense. I think that it's the latter of the most straightforward, the in common use question. We certainly have would have no problem with the court going either route. That arises because when we get into the business of talking about this dangerous and unusual, at least the dangerous nature of it, I want to make it clear that all these weapons are dangerous. And particularly, it said that handgun is dangerous because it's lightweight and can be moved a whole bit. So that cannot be the determinative factor. Otherwise, then we're left in the untenable position, in other words, untenable, of differentiating between a handgun and a machine gun and figure out, well, when does it become dangerous and unusual? But it uses that language. And I don't think Bruin gave us that standard, gave us that language of statute that said, is it in common use for a lawful purpose? I think your focus is right. Step one on the Bruin, which comes into the plaintext of it when you analyze in the words of the Second Amendment that brings those in on the Bruin before you go into that second step of shifting the burden to the government. So, Judge Wayne, as you know from our supplemental brief, and I realize there's disagreement maybe among the members of the court, but we think that that the common use question does belong under the first textual step. But again, I don't think it matters because the Supreme Court said that that common use limitation, it said in Heller, that common use limitation is fairly supported by the historical record that supports banning dangerous and unusual weapons. It may matter in terms of the narrowness of the, of the, of the interpretation. Once we go into step two, we're in a whole different world. If we're talking about plain text and does it fit within the lawful purpose of the text, that's a burden, at least in terms of the termination of plain text, is pretty straightforward. Straight textualism dealing with that, that basically when we slide into the other section, we're in a whole different world. Generally speaking, you are, you are, Your Honor, but I don't think you are in the context of common use because the Supreme Court has said that the common use limitation on the Second Amendment accords with historical understanding. And in fact, Bruin repeated that. So Bruin at page 47 of the U.S. report said that the Second Amendment, quote, protects only the carrying of weapons that are those, quoting Heller, in common use at the time, as opposed to those that are, again, quoting Heller, highly unusual in society at large. So doesn't it, doesn't it matter if it's at step one or two because the burden of proof differs? Is it your position that even if the burden of proof is on the state, you have satisfied that burden? Yes, Your Honor, it does affect the burden. I think that's fair to say, but it doesn't affect the burden sort of on whether the common use limitation is consistent with history because Heller and Bruin said that. It only affects whether this particular firearm is in common use. And again, that's part of the reason we think it fits better in the first question, and that it's very odd to be sort of looking at the historical tradition of firearm making. Were you in the courtroom during the last argument? I was, Your Honor. Yes. Well, it seems to me if we go down that trail where if you look at the plain text, it has nothing to do with that. The plain text, they said, is unrestricted and the restrictions come in by showing historical notion. The language, I'm trying to think of the exact language, but it's basically the weapon that's a bearable arm. And and if we get into that discussion, it seems to me your suggestion that we go right to the one of the historical things that you suggest the best is that it was not in common use for lawful purposes. It seems to me that is a much more constructive suggestion than the enormous debate about what we engaged in during the last argument. Yes, Judge Niemeyer. And again, they sort of circle back to Judge Proudbaum's question, if we bear the burden of showing that these firearms are not in common use, we think we can meet that. It wasn't even until the supplemental brief that Mr. Price's counsel attempted to demonstrate that firearms with obliterated serial numbers may, in fact, be in common use. And I don't think even embraces that position fully. Well, wouldn't it have to also be for a lawful purpose? And and we're talking about a regulation imposed by the state to assist in law enforcement, which is not even directed at the nature of the firearm or how it functions or whatever. It's it's as you pointed out, it's how to solve these bank robberies and these murders and et cetera. And it seems to me this would be a lawful purpose that the person who obliterates doesn't have any lawful purpose except to avoid evidence that points at him. That's correct, your honor. So I think that the ATF statistics that both parties cite in supplemental briefs actually demonstrate that firearms with obliterated serial numbers are not even probably in common use for unlawful purposes among crime guns. So the ATF statistics indicate that only 2.5 percent of the crime guns that are submitted to ATF for tracing have obliterated, removed or altered serial numbers. So it was a percent 2.5 percent. So the number that's submitted to ATF is about 5000 to 6000 per year. And those are crime guns. So that means that even among criminals, these are not the preferred weapon. And can I ask you a clarifying question? Earlier, you said it's two ways that we can rule in your favor. You said one was the historical evidence that you put forward about markings on guns. And an alternative way was historical, but not in common use for a lawful purpose. You said your markings are kind of historical analog and the other is the common use question. Why are those different? I thought the question whether a gun or a weapon is in common use for a lawful purpose. That's the historical analog, is it not, that dangerous and unusual weapons can be banned? Your Honor, I think that I think there are different questions. And the reason is that in, so take, for example, Bruin. Bruin concluded handguns are in common use today for lawful purposes, no question. And so then Bruin started looking to those historical analogs to determine whether a limitation on the public carry of firearms was... The question of whether, where did the court come up with the idea that the weapons that are dangerous and unusual, did they look to history? So, Your Honor, yes. That was the historical analog. Isn't one of your analogs here that these weapons are not in common use for a lawful purpose? And historically, the government's been able to regulate and ban those sorts of weapons? Well, Your Honor, I don't think that's actually a historical analog question. So we have our historical analogs and then we have the sort of separate question that the question, present day question as to whether or not a firearm is in common use. What's the principle that your historical analogs are getting at? What's the historical principle I'm supposed to draw from the markings on the firearm? So, Your Honor, if I can answer that in two ways. So I think there's there's one historical principle that the Supreme Court has resolved, which is that as a historical matter, firearms that are not in common use can be banned. The second historical principle that we've read. The first one is a historical principle. Correct. That's a historical analog that you could try to draw comparisons to today. Yes, Your Honor. And we and we argue they're not in common use. And then the second historical analog, I think, is the sort of more traditional Heller Step 2 test is where we say, let's assume that they are in common use. The Section 922K is nevertheless consistent with a historical tradition of regulating commerce and firearms and specifically preventing the obliteration of markings on inspected gunpowder. Historical justification. That's correct, Your Honor. If you conceive of the common use as a historical question, I think it doesn't it doesn't matter whether you can see that it's historical or plain text because the Supreme Court has resolved it either way and said it exists, it's consistent with history. It may be a textual question, but whether or not it is, it's done. So if I if I don't find your, you know, markings on gunpowder or whatever, totally persuasive. But I do think that this is a Step 2 question. Can you still prevail because there's a historical analog to weapons that are dangerous and unusual? Your Honor, we can, but I don't think we need to, because Heller cited, I think, eight or ten different historical sources right after that line that it said the in common use limitation is consistent with a historical tradition. You don't have to repeat all of that. Right. Sure. So we can satisfy that historical part of it. And then all we have left is the present day question of whether or not these firearms are in common use for lawful purposes. And again, as I was addressing earlier, they simply aren't even for unlawful purposes, but particularly for lawful purposes. There's just no reason why a law abiding citizen would want to possess a firearm with an obliterated serial number. Again, the statute doesn't apply to firearms that were manufactured before 1968 without serial numbers. All the firearms that are presently manufactured and imported into the United States come with serial numbers. So the only way a firearm can end up like this is if someone takes a file to that serial number. And Mr. Price's view is that this court should assume that the obliteration of serial numbers happens sort of the same rate in the population as a whole as it does among those five to six thousand crime guns per year that are submitted to APF. We just think that there's there's no basis for reaching that conclusion. And again, we rely on the Third Circuit's observations that setting aside whether these were in common use for sort of any purpose, there's just not a lawful purpose to possess them. So we think that the obliteration statute didn't take effect until the late 60s. Is that right? That's not quite correct, Your Honor. So the 1938 Federal Firearms Act had a prohibition on the receipt of firearms in interstate commerce with an obliterated serial number. And then in 1968, that was sort of passed again, taking away the presumption that the 1938 statute had that if you possessed a firearm in interstate commerce, you had actually been the one who obliterated it. And then it was in 1990 that the court, excuse me, Congress added the possession of a firearm that has previously moved in interstate commerce. Is there a statute that requires firearms to have serial numbers? Yes, Your Honor. That was part of the 1968 Gun Control Act. So before 1968, there was no requirement to put a serial number on? That's correct. There was no requirement, but it was extremely common, done voluntarily by private manufacturers dating back to the 1800s. It seems to me that that's such a de minimis regulation of a firearm to say it has to have a serial number that you could the common use is the flip side of that. It's even more uncommon to have this firearm removed. And the only core purpose for removing it is to protect a user from uncovering his misuse. That's right, Your Honor. And so there's sort of a de minimis notion here. I mean, we're talking about this goes back to the notion that our serial number is really the regulation of firearms. When we're talking about you have to have a serial number. And if you obliterate a serial number, it's a crime. So, yes, Your Honor, we made a separate argument that there's no infringement of the Second Amendment. Right. That was potentially foreclosed for a little while by the Maryland shall issue case. I think that we are certainly are backing away from those arguments. No, but you have a court that that approached it under the Constitution. And your argument is that it's an outlier and we should correct that. Absolutely, Your Honor. And if the court has no further questions now, I'll save my time for rebuttal. Thank you, counsel. Thank you. Mr. Coleman. Thank you, Your Honor. Flex Coleman on behalf of Randy Price. As far as the issue that's going to decide this case, it's going to be whether you choose to apply for as it's written or do something else. And that's in part what the United States is encouraging you to do. Instead of a phalanx of cases, I would characterize Judge Goodwin as the 300 Spartans at the mob. He was the first and he did apply Bruin as it was written. He looked at the text. He looked at the Second Amendment. What did it say? Well, there was no question that the parties in that qualified as part of the people for Second Amendment purposes. Correct. And the first case we had here, I don't think that's an issue either. But here, tell us why Mr. Price is part of the people. He's twice convicted of violent felonies. Why is he part of the people? Because Scalia in defining the operative clause defined the people the way it is in the first court and saying under the Second Amendment. Remember, he went to different parts of the Constitution. Judge Hammer, you're right. It wasn't a dictionary definition. A lot of the dictionary definitions were consistent, but Justice Scalia looked at those parts of the Constitution and looked at it as a, what did he call it, a citizen or a status type right unrelated to the individual. A member of the political community. And then under the first, under the first fourth and Second Amendment, right, you're a member of the national politics, the national community. Do you think we interpret those, the Article 1 and the second fourth amendments, impairing materia in that regard? We don't say that anyone convicted of a felon doesn't have their free speech rights. We don't say their past conviction deprives them of the right to be free from lawful search and seizures. That's that's true to a limited extent. And I've read the other circuit opinions, particularly the Third Circuit, when they go through and make these comparisons. But I'm doubtful that they're accurate. Under Article 1, the members of the House of Representatives are elected by the people, but felons don't vote in that. Second Amendment and the Fourth Amendment, the Fourth Amendment will cover convicted felons, illegal aliens. But arguably, under the Second Amendment, they aren't law-abiding responsible citizens and illegal aliens are not entitled to a gun. So it doesn't seem like to me that they're necessarily the same in each amendment. Well, when we're looking at Bruin's first step in the textual analysis, there's no distinction in the Second Amendment as to law-abiding people and non-law-abiding people. To any of the people, just like it's the orange, and it's necessarily general at that stage because keep in mind what happened. Heller identified the individual right for the first time. Justice Stevenson's CALEA went back and forth for 67 pages. And in the end, the result was not these details we're working out now through the courts, but is there even an individual around? Where, in your view, does the constant refrain in Heller, Bruin, McDonnell of law-abiding responsible citizens, where does that fit into the analysis? Well, in two places. The first, it's the apex, that's the top, that's for the right. Back when we were going, certain people can get part of the right and not all the right, which I never thought was correct. But that's what the courts did for almost 15 years. And then Bruin comes out and says, well, no, we're not doing this in scrutiny. We're not using your status to give you a partial right here and then subject it to intermediate scrutiny. That's the first. They said it was one step too many. He did. And then we go to the next point. Is that it fits in in the historical analysis. It's the idea. You do the generality to get the presumption. It's only prima facie. And then it's up to testing what with history, with a well-established representative regulation, either disqualifies it because of who someone is, what a gun does, how it's used. All three. Well, let's say in common use was used in Heller seven times, minus two in the five, minus two in the syllabus. And then it's kind of the same situation with law abiding citizen. And again, there are several cases that refer to that and some of this court and others is more dicta because those determinations were essential to the finding of the court, which was whether it was an individual or a collectivist right. So it's in the mix. No doubt. I don't think it prohibits the Bruin step one at all, but it definitely comes into play in the second step. And that's being litigated now. 922 G. Judge Wilkerson is. I've got two cases before this court and I know Canada has already been argued. I'm not sure how that's going to come down, but this is being litigated around the country as it should be. I mean, Bruin did act kind of as a sea change in a way and saying, no, everything else we're doing, we've got to go back to Heller and do it the way Heller did it. Mr. Clark, can I ask, do you believe that the law that requires manufacturers to put a serial number on a firearm is unconstitutional? I think it's got a lot better chance of surviving as a commercial regulation than possession. Do you then it's further. So, OK, so the gun has to have a manufactured after a certain date, it has to have a serial number. Do you agree that it's a crime to literally take a file to the barrel and obliterate the serial number, that there's a law that would be illegal to do that? That's what Congress has passed. Do you believe it is unconstitutional to forbid people from removing serial numbers? I think I've got a better argument than I would the manufacturer being the firearm. I'm not asking if you think you have a better argument. I'm asking if you think that is unconstitutional. Because you see what I'm saying. I guess I'll just lay this out. If it is lawful for Congress to require serial numbers and it's lawful to forbid you from removing the serial number, I don't see how it's not then lawful to prohibit the possession of a gun that's been obliterated. So it seems to me I don't see how you can possibly win this challenge unless it is also unconstitutional to forbid someone from obliterating a serial number. Well, the reason I don't believe the three are the same. I'm not asking if you think they're the same. Let me put it this way. If I think it is obvious that Congress can forbid you from obliterating a serial number, do you have any argument that remains that they can't forbid you from knowingly possessing a firearm with an obliterated serial number? It goes to the burden on possession in the text of the Second Amendment. We've got burden. The manufacturer is required to put a number on it to sell. Right. Okay. The Second Amendment doesn't protect my right to sell a firearm. It protects my right to bear and carry one. Same thing with an obliterated serial. Once you get it, you've got a stronger case. You don't have a constitutional right to obliterate. You have a constitutional right to possess and carry a weapon. Sure. So. But it seems to me that the possession for unlawful purpose doesn't fall within the scope of the Second Amendment, does it? Kind of get two things going here. Well, I'm picking up on on the argument that we're not talking about the obliteration. That's a law, an okay law to obliterate the serial number. We're assuming that. Yes. The issue is whether possession of a gun that is obliterated is unlawful. And you say, well, the possession aspect is protected by the Second Amendment. I would agree that it's presumptively covered by the Second Amendment. But then you get into the notion that that is the possession of a firearm for unlawful purpose. Well, because you're violating the law and possessing one, especially if you do the obliterating. Well, the unlawful purpose doctrine, as well as the dangerous and unusual doctrine or limit, that's better than their limits, goes to physical characteristics of the gun. It's still a handgun that's out there to use as a handgun. If you look at the ACF statistics, 1.5 million of the handguns with serial numbers are crime guns. So what's the more unlawful use? The serial number of guns that measure 1.5 million or the 2.5 percent, which are right around 50,000, that they say have obliterated and that's why they can't trace them back. There's also another assumption that I want to make sure the court's doing right about tracing. All tracing does, all these serial numbers do under the Gun Control Act, is get from the original seller to the original buyer. Only 12 percent over five years got to the person who possessed it in connection with committing a crime. That's not 1 percent, but it's still out of almost 2 million guns. How much is that really? I mean, there's some help and, of course, we always want some help, but we're talking about a fundamental right under the Second Amendment. And by virtue of possession in this statute, 922K, possession of an arm which is protected conduct, there's an assumption that the only reason it doesn't have a serial number is for bad acting. And you know what? There are bad actors that take it off. But there are also people that come into possession that are not bad acting and simply have a gun that has a serial number. It doesn't even have to be obliterated. It could be damaged a little bit. There could be a ding on a letter, on a number. And the law of this circuit is that's enough to show substantial damage to enforce, if not a sentencing enhancement later, then certainly even a conviction under 922K. And that burdens a right protected by the Second Amendment, even if it's only for 2.5 percent of the population. And that's assuming they're only criminals. And it's still this is a variation of function. And Judge Rushing, in the prior hearing, you asked the right question. If in common use goes to the first step, how does it possibly happen on a historical basis? When Heller says multiple times in Part 3, as well as in part of Part 2 of the opinion, that it's historical, historical, historical, that's ruin Part 2. If it's in ruin Part 1, it has no use in Part 2. Is removing the serial number adapting the gun for an unlawful use? Not in a functional context, no. But if we have this evidence that the reason serial numbers are obliterated or removed or altered is to prevent tracing to people, illegal acts can't be found out, it's the filing off of the serial number adapting the gun to unlawful use. There are certainly instances where it is. And there are certainly plenty, probably, where there's not. How do I figure that out? The government should carry the burden of proof and show it to you under Part 2. That's how they should show it. There's a lot of assumption going around because we can't, what's the legitimate purpose? The purpose of that action is possessing a gun. That's the condom. But you have the gun. Before you file the serial number off, you have the gun. Now the question is when you take a file to the gun and remove the serial number. But that's different than what's happening under 922K. They're not filing them off. They're just possessing the gun. Well, that's an important clarification. You think they're just, the district judge mentioned an innocent possessor hypo. Just so we're clear, this statute doesn't prohibit the possession of a firearm that happens to have an obliterated serial number, right? The government has to show that I know it has an obliterated serial number, right? Yes. OK, so the minute I know it has an obliterated serial number, I know I have a weapon and it has to be a firearm that was required to have a serial number. So it can't be an antique, one of those that was made before, right? So I know that I own a firearm, that I come into possession of a firearm that had a serial number, that someone took an act to remove the serial number, which was illegal when they did that, right? That's hypothetical. True. Well, so then you say you have to surrender. It's contraband at that point. What's wrong with saying at this point it's known possession of contraband? It's only contraband because of a 1968 statute that makes it contraband. Or I can go by the United States version by going back to 1938. It's only contraband because of a 20th century statutory act of Congress. Whereas every firearm before then, except I thought we agreed that that statute was constitutional. And so it makes it for an unlawful purpose. And if you go back to the analogs, the historical analogs, it all of a sudden now becomes subject to regulation. The imposition of the statute requiring a serial number is not a Second Amendment problem. Not what manufacturers have a right to possess firearms, right? Well, the government has a right to require it, too, right? I think that would fall under commercial regulation. Right. OK. So once now we do make it illegal, you're suggesting that because historically it wasn't illegal. But that doesn't matter. The historical aspect is whether you can possess something that is for an illegal purpose or you can use. Well, I can possess something without a serial number. The insertion is it's only for an illegal purpose. And there's no basis for that. That's that's an assumption. It's not an irrational assumption. And there are that statute says if you if if it's obliterated, it has to have a serial number and you can't obliterate it. Now, the question is, who do we impose that against? We're one step removed with simply possessing, not removing a gun. His comment came into Mr. Price's possession that didn't have a serial number. Under current law, presumably because of the conviction, he knew that. Right. I beg your pardon? Because of the conviction, he knew that he knew the serial number was obliterated. Right. I can't believe that. That's not in dispute. That's OK. That's not in dispute. All right. Now he's holding a gun illegally, he knows, against the law. He's trying to possess a gun which is illegal, which has been made illegal. It's not made illegal because he's a felon in possession. No, it's made illegal because it's obliterated serial number. OK. And that's where we get to this lack of a historical analog. It's only illegal because of the 20th century legislation. Prior to that, every gun in America didn't have to have a serial number at all. And we still have a percentage that are in circulation that were manufactured before 1968. And there's nothing wrong with them. They're not unusual. They're not dangerous. So what does that make them? You recognize that yourself, the flip side of not being dangerous and unusual. You know, it makes a difference here. The fact that this is a federal statute, because both Heller and Bruin dealt with state regulations. But what we what we have here is an act of legislation by the entire Congress. And I learned very early on in law school that there's a presumption of constitutionality that attends act of Congress. It may be one thing to strike down a state regulation because sometimes in the New York regulation or the D.C. regulation at issue in Heller and Bruin, sometimes a state by definition might be able to get out of line. But it's quite another thing to say, well, the whole Congress got out of line. There's a presumption of constitutionality that attends to federal statutes and to what the Congress is doing. And again, in Heller and Bruin, what was presented to the court was a state that had gotten too far onto the restrictive end of the spectrum. But that's not here. You're asking us to take the United States Congress and a key law enforcement provision and say to the Congress, you don't know what you're doing. That's what it seems to me the bottom line is. Judge Wilkinson, I'm sorry you see it that way, because the overarching consideration over all gun legislation, except for what was done in 2023 after Uvalde, was that we had to collect this interpretation of the Second Amendment. We only needed to satisfy national basis. If we could articulate a governmental purpose, it passed. I know. And then we didn't have it. There are all sorts of Second Amendment questions. We don't know whether common use refers to, suppose you have a large number of people that is still a very small percentage of the entire population. Is that common use? Or if you have a large number of people and it doesn't matter what percentage of the overall population, it's enough that a large number of people have a particular weapon. The point is, common use is vague and there's been no attempt to define it with precision. And until we get something that is much more explicit, I can't see taking what I think is a draconian step in telling the United States Congress, which is trying to ensure the safety of people across this land. And we might as well look at the fact that because it was a background of what Congress is trying to do. And this is a mass shooting epidemic in this country. And it could be with the amicus briefs that pointed it out. I don't know that they're accurate in every particular, but in the general picture they paint, it rings true. And the figures that they put out, there have been more than 2,500 mass shootings occurring in the United States since 2020. 610 in 2020. 689 in 2021. 644 in 2022. 656 in 2023. An average of nearly two per day. And here we are presented with a series of lawsuits, including yours, that says we're going to say in the midst of all this, that the Congress of the United States in this federal statute didn't know what it was doing, or was trespassing upon constitutional values and inhibitions. I just don't get it. Your Honor, there have been over, tragically, a thousand mass shootings, the way they define it now, just this year. What we haven't had in the 20th century is the deference to the Second Amendment. None of these lawsuits that I'm aware of, including my own, in this crisis, in any way speak to trying to avoid protecting American people. But when you get into that type of position you're looking at, you're going right back to means and balance. It's like diminishing, this isn't much of an infringement on our right. Heller brought up none versus state in its discussion of the operative clause and said it perfectly captured the way the operative clause enhanced the prefatory clause. And it did a long quote of what the Georgia Supreme Court said back then in the 1800s. But it said basically that this right shall not be infringed, curtailed or broken in upon in the smallest degree. Mr. Coleman, so just to follow up on, I'm over here, sorry, right in the middle. I'm sorry, Your Honor. That's okay. I recognize your voice. It's my eyes. Well, thank you for that anyway. I appreciate that. So to follow up on Judge Wilkinson's question and to make sure I understand your position, because earlier you conceded, I think correctly, that Congress has the right to require gun manufacturers to prohibit the obliteration of those serial numbers from those weapons. So if someone takes a file to a weapon, you conceded, I think, that Congress could prohibit that. Well, what I would concede is that it's a better case of the statute surviving review. It would depend on how it was tied to infringing on possession. Okay. But it's not nearly like possession. Right. Right. So the third point I was going to make is, but when it comes to possession, not someone who actually obliterated the serial number, but simply possessed it, at that point, you say that the Second Amendment comes out in full bloom. And at that point, the legislature is hamstrung in what it can do. And essentially what you're saying is it has to actually wait until that particular individual uses that weapon for an unlawful purpose. And only at that point can the government then take action. Well, maybe it's the defender in me, but I look at the Bill of Rights as always hamstrung. I'm not sure you answered my question. No, I'm going to answer it. Yes. It's like I said in the beginning of my argument, it's a flying broom. So the answer is yes. The answer to my question is yes. The answer is the way this is applied here, yes. I believe Judge Goodwin did it correct. He went to the distinctly similar analysis because it was an old problem. It wasn't new. And the technology for fixing die marks to barrels existed in the 1700s. They could be done sequentially. Anybody questioning that, look at how they used to do a printing press. Can I ask you a question about the actual statistics? So if we started to say we want to understand whether these are in common use. We sort of really focused on, I think, two studies the government provided us. One is the ATF study. And that's had some selection problems because that's only the guns that law enforcement submitted for tracing. The ATF was unable to trace, right? So it doesn't include the hidden serial numbers that are included on lots of guns now, almost all the cold hot points, etc. Nor does it include those that were forensically recovered, which ATF has an entire branch that was done. So the two and a half percent missing in three different ways, at least three different ways. They also cited to the Boston study, though, and it sort of seems to solve some of those problems, right? Because that's all guns that are seized, so not just those that are submitted for tracing. And the Boston study found that 20 percent of guns in that particular study had obliterated serial numbers. Is that your understanding of the Boston study? I'm sorry, I haven't looked as hard at that as I did the ATF numbers. OK, if maybe I'll ask, maybe then I'll ask your colleague this on remand, if you're not familiar with the Boston study. Not like I'd like to know. Well, then I don't think your answers will be helpful. Let's say it is. You're still. Well, just accept for a minute, hypothetically, that it says that 20 percent of the guns that were found had obliterated serial numbers. That would tell us something about like that's a relatively prevalent or common thing to be carried, at least in Boston during this particular time period. For Boston crime guns, correct. And then if the study, and just accept this hypothetical that it does, that with respect to whether the guns that had obliterated serial numbers were more likely to have been used in substantive crimes, the study actually showed that most of the guns, it was 50 percent less likely to have an obliterated serial number if you committed a substantive crime. So if you had murder or robbery or assault, that you were actually less likely to have an obliterated serial number than if you just merely had the gun and were not committing an independent crime, a non-possession crime. Exactly. And that's been true with 99 percent of the mass shootings in the past decade. That's right, which sort of would suggest to us that, in fact, whatever number of guns, if it's a small percentage like the ATF study suggests, or more like the 20 percent that the Boston study suggests, that you're more likely to have a gun with an obliterated serial number if you're not committing substantive crimes, right? That is, you are engaged in lawful conduct. Certainly, that's an inference, yes. Right, and that inference is what suggests to us, or ought to suggest to us, that when we look at whether obliterated serial number guns are in common use, right, whether they're common, we conclude just actually looking at statistics, not trying to surmise why somebody might prefer one thing or the other, we can actually conclude that they are common, right, at least based on the limited data that we have here. Absolutely. Well, let me ask you, it seems to me that the class of guns being discussed in those studies are guns seized from criminal conduct or submitted for tracing. But that doesn't take into account the millions of handguns that are in circulation locally. And so this probably less than one percent, I'll bet you it's a fraction of a percent when you consider the, how many handguns are there in the country, 200 million or maybe more? Well, that's not allowing for the ones that aren't submitted for tracing. No, I'm talking about in common use. I mean, when you're talking about common use, wouldn't you be talking about societal use? Well, generally, Your Honor, but forgive me, I don't remember if it was Judge Atee or Judge Wilkinson, we don't have a test, which is unfortunate. No, I know some things are common sense. And it seems to me that if we seized X number of thousands of guns during crimes and we compare that number against all the guns that are in circulation, it's going to be a very small number. In other words, the common use is a common notion. It's not it's not breaking down classes of guns that have been submitted for the ATF or that have been picked up in crimes. It's how many guns in society have obliterated serial numbers. And it seems to me whatever number you pick is going to be a fraction of a small fraction of one percent. Well, that gets back to several points I raised earlier. One, it suggests it's a de minimis in fraction on the right, which is contrary to Helen. Don't you think that that may be true, that it's de minimis? I don't know, but I'd certainly not de minimis, Mr. None of the data we have suggests that it's de minimis, correct? We only can rely, you know, maybe not only, but the data suggests it's not de minimis, that it's not less than one percent, that you can make that number up if you choose. But if you actually look at the data, that's not what the data tells us. Correct. And more importantly, it's not consistent with Helen. So following up on that, then there are instances in which Congress could enact the statute if the data supports it. Shelby County being one in which the court invalidated Section 5 of the Voting Rights Act, because it said you don't have that information, that background evidence to show it, the numbers and the data is not there. So are you suggesting to us that there's an affirmative here, too, because Congress, in enacting this particular statute right here, did not have this data? Now, we can look at the Boston report or whatever, but none of us are really statisticians and really don't understand. We can take traditional notice of it for some purpose here, but we're not a trial court in that instance in terms of what it all means. We can throw these numbers around and come up with, well, most people who had a gun without an obliterated number on it didn't commit a crime. That would lead you to believe, well, don't put in obliterated numbers on a gun. That means the crime is going to go down. That doesn't make any sense at all. So are you suggesting at this point that with the situation we have and data discussion, that perhaps even if we go in your direction, that we could indicate to Congress that you could make this constitutional if you conducted hearings and information on this that would support the data to support making this an offense that would be in common use for an unlawful purpose? No, sir, I'm not. I'm acknowledging with Judge Richardson that the data support. So even if the data, even if the data Judge Richardson suggested wasn't 20%, if it turned out to be 80% or 90%, on your view, it doesn't matter. Because in common use has to do with a functional characteristic. It has to do with, is the gun going to, what are we using? I mean, think about the. And it doesn't matter the question of whether for lawful purposes in that analysis doesn't factor in. Just the functionality. It can be for an unlawful purpose and it's okay as long as it doesn't deal with functionality. It can be for. What is the answer to that question? You understand what I'm going to go off that? Is. I'm not saying lawful purpose. I'm not saying that at all. Okay, well then tell me how does it factor in with an instance in which is common use for an unlawful purpose and yet it doesn't affect functionality. What do we have establishing the unlawful purpose beyond the assumption that changing is possessing a gun? We don't need that if we already can say the functionality kicks it out. My question is, if it is unlawful, does that factor into it, even if it doesn't affect functionality? It's not unlawful on the basis of the fact you have it without a number. It would be unlawful if you were using it to commit a murder or a crime or a violent offender. And that's going to be case by case. Let me make sure I'm talking to you. Common use for a unlawful purpose. Not the gun itself being unlawful. Not that. Common use for an unlawful purpose. If it is in common use and the evidence of the data shows people are possessing it for an unlawful purpose, your statement is it does not matter because the functionality is not impacted on the gun. Is that true or false? That's false, Your Honor, for this reason. Because of how Scalia discussed Miller and compartmentalized the discussion to functional characteristics. That's the only reason it's true. All this has been on how the Heller court decided to frame the issue and how we've had to work with it since. So the idea of a gun case would deal with a totally different type of issue. Well, yes and no, because the court gleaned the whole analysis from Miller in arguing with Justice Stevens, who said that Miller justified a collectivist view for the militia and got into a discussion of what kind of guns are not protected. You, in the past argument, have focused on short barrel shotguns. Are you familiar with the Shockwave? I didn't brief this. It's not the Shockwave is manufactured by Mossberg and Remington. It's a 26.3 inch length shotgun with a 14 inch barrel. It's been manufactured and was approved by the ATF in 2017. It looks just like a sawed off shotgun. Is it in common use for a lawful purpose? It sure is. For home defense. And it's selling like hotcakes. I don't have the stats in the brief. I'm briefing it for another case you may see in six months or a year. But I was shocked at first. I had to go ask an ATF agent, how the heck is this legal? I had to go ask a gun dealer. It is. So Miller makes that point. That's something we can litigate later. This has to do with the number on a gun and somebody being exposed to 15 years in prison for having a number. Obliterating serial numbers is in common use for a lawful purpose. That is your statement? Possessing a firearm, in this case a 25 caliber pistol, is what is in common use at the time for law. Except that's not the criterion for the crime. The crime is possessing a firearm with an obliterated serial number. And that distinguishes it from any other firearm. Now, I suggested earlier in the argument with my questions to counsel whether this is even regulated by the Second Amendment. Because the question is, this is sort of a law enforcement tool that exists. It was enacted to help law enforcement, I would think. And it's there and doesn't implicate the right to bear an arm. It says the right to bear. It denies the right to bear an arm that has an obliterated serial number. But it's still step one. Well, and when we get to rule step one. But my point is I agree on that because step one is they say in the statute it's unlimited. It's on the regulation has to come under the historical analog. Right, Judge Haberman. And once you get to that. But then you're stuck with it for a lawful purpose. I beg your pardon? Then you're stuck for it's not for a lawful purpose to have an obliterated firearm. Well, again, only because of the 1968 statute. So what? That doesn't you don't need the analog for that. The analog tells you that unlawful purpose is the right structure. But the fact that it's unlawful and constitutionally unlawful to not have a serial number on or have an obliterated serial number. That's how Bruin worked and Bruin would not have been decided the way it was and I would have held it. The legality now is a modern convention of the 20th century. And that's what we're opposing. I mean, yes, it's illegal now. That's why my client's here. That's the only reason I'm speaking. Thank you, Mr. Coleman. Yes, sir. My time's up. I appreciate you. And then, sir. I'm sorry. Yes. Mr. Glazer. I may please the court. Just a few brief points on rebuttal. The real question that the court needs to decide is whether or not firearms with obliterated, removed or altered serial numbers are in common use for lawful purposes. Judge Richardson, I apologize. I did not print out the Boston study, so I can't respond in detail to that. But my understanding was that study was of juvenile offenders and the guns that were seized in connection with the juvenile offenders. Right. But the point of that is, so this is a little bit the Judge Greenbier's point. You can't say it's for an unlawful purpose when the only unlawful purpose is the outlawing of possession. Right. So that's circular, right? That doesn't get you anywhere. Right. And so the point there was that of the guns that were seized, right, 20 percent of those involved obliterated serial numbers. Right. And so that's an assortment of guns that were seized, 20 percent involved obliterated serial numbers. But of those, right, substantive crimes were less likely. Those that were used in substantive crimes, instead of mere possession, right, which is circular, to say that that's an unlawful purpose merely because that doesn't get you anywhere. But those that were used in substantive crimes were less likely to have obliterated serial numbers than those that were not used for substantive crimes. And that suggests that your statistics, like, have it backwards. Right. Because you want to say, I think, you know, maybe by some sense of logic, that since there's so few used for crimes, there must be even fewer that are used for lawful purposes. But the very study you give us tells us that's exactly backwards. So, Your Honor, I don't know the explanation for why that study came out as it did. And maybe because that's the facts, right? The reason it came out that way, perhaps you submitted it. Right. It's not my study. You're the one that chose to put it in. In fact, it was the primary study you relied on, the ATF study. You don't bring in until the supplemental reply brief. Yes. Right. So it's the primary study. It finds 20 percent are. And then of the 20 percent, it's more likely to have an obliterated serial number if you're not committing a crime. Your Honor, I just there's no there's no possible way that it can be the case that firearms with obliterated serial numbers are more common for lawful purposes among the law abiding population than they are among criminals. Why? Why? What possible basis do you have to suggest that? Because the only data that you gave us told us. So, Your Honor, again, I don't I don't have because I don't have a study in front of me. I can't give you the explanation for that result. It certainly seems anomalous, but if I can explain it this way, there is no possible way to measure the sort of exact number of firearms with obliterated serial numbers that are that are out there today. And the reason is that, first of all, surveys don't work because nobody's going to voluntarily say that I possess a firearm that's outlawed in 41 states and by the federal government. Secondly, we don't we can't we can't actually find, you know, sort of every crime, every gun that law abiding or non law abiding citizens have. So what we have to do is we have to rely on those guns that are seized from crimes. And again, I take your point that the Boston study points in a different direction. But I think common sense, the Third Circuit's decision that went the back that up, even though the Law Review article that cites the Boston study that we cite indicates that actually the it's the only reasons for possessing those firearms. It's not what people say. Right. But the data points the other way. Can I ask you one other question? And you may not have the answer to this question either, but the ATF study seems confusing to me. And it may just be that it's a typo. But the fact that there's this kind of typo suggests maybe the ATF study is not worthy of relying on. But it indicates in, I think it's page 39, but it may be later, that there were three thousand six hundred, three thousand and sixty five, three hundred sixty five thousand traced quote traced crime guns with obliterated serial numbers that were recovered. Right. So that's. And yet earlier in the report, it said there were 80,000 that were not able to be traced because of obliterated serial numbers. Those two numbers are obviously massively different. Right. And change fundamentally the way of thinking about this. Right. And it might be that it refers to hidden serial numbers. It might be that it refers to recovered serial numbers. They're forensic. But do you have any explanation for why in one place they're suggesting 80,000? And then if you look on page 33, I'm sorry, I have the wrong page. Sure. Right. It says, you know, in the last sentence of the paragraph at the very top, similarly, twenty five percent, three hundred sixty five thousand of the traced guns with obliterated serial numbers were recovered. Your Honor, I'm sorry, are you do you have part two or part three of the part three? OK, I'm the line right above the figure. Sure. Dash 14. Got it. Then it begins with similarly twenty five percent, which is three hundred sixty five thousand of the traced guns with obliterated serial numbers. Yes. So, Your Honor, that sentence talks about the recovery within three years of purchase. So that's talking about the time to crime. Right. But that means there were three hundred sixty five thousand traced crime guns with obliterated serial numbers. You understand? I mean, yeah, I mean, yeah, but if we look earlier in the report, I mean, maybe the point is we shouldn't be relying on the ATF for this stuff. But early in the report, they say there were only 80,000. Right. So those two numbers both can't be true unless one of them is is measuring something odd. Your Honor, I agree. And I apologize. I don't I don't have an explanation for that. And your honor, do you have any other do you have an explanation for any other statistics that you might have submitted that would help us? Your honor, the two statistics that you've given us both seem to cut against your position. And I understand you want to rely on common sense and logic. And that's great. But typically we look at actual data. Your Honor, I don't think the ATF report cuts against us. I think there are some anomalies that I can't explain right here from this lecture in the report. But I don't think it cuts against us because I think. What about this consideration? You're looking at guns and you find out the number without the number on it says, well, only a percentage of these were used. What about all those ones that had the numbers on them? That people kept those numbers on them because there's a law that prohibits you from taking that number off. You're a criminal and you decide, well, if I take this number off, that's a crime. If I get my gun, they're going to have it. So most crimes, if we go with this law as it's going now and end this, why would anybody leave a number on a gun, even a lawful citizen? If your gun is stolen, that number traces it back to you. Why would I do that? Why would any lawful citizen, if this statute is not constitutional, have a gun or any weapon for any reason? If you have any belief that you're not going to commit a crime, but you can leave it to someone, someone to pick it up and it comes back to you where there could be some liability or whatever. So when you look at these statistics here, all well and good, you say, who's going to come up and say, I got a gun without an obliterated number? When you see it, you're seeing the obliterated numbers, and that's a tough word to pronounce, you're seeing that number off of there, you say, well, only this percentage was used in crime. But what about, that's not the point, there's a law that kept you from even having those guns, so the number is suppressed, like machine guns, the number is suppressed because we have a law against it. If you say everybody can have a machine gun, you'll probably have a plug-in, and I'd like to know when it's going to happen, because then I'm investing the stock on it when it happens. But, and so here we've got an instance of, you've got this data here, and maybe as you said, it's good news, because what it's telling you is that we can trace those numbers on the guns for criminals, the guns that are used, most of them have a serial number, and the reason they've got a serial number is because we have a law that prohibits them from taking it off. So, your honor, I can't speculate exactly as to what law-abiding citizens would do if 922K were not on the books, but what I think is clear is that stolen firearms would almost invariably have their serial numbers removed, and it would be very difficult to recover stolen firearms, because anyone who steals a firearm would have an immediate incentive to file it off, because there would be no punishment on the back end for possessing that firearm. It strikes me that much of what we're discussing about common use and lawful purpose, it strikes me that at bottom, these are empirical questions, and with these data points, they're empirical questions, and the question is, how do we go about accessing the information? And it strikes me that many of these questions that we're debating here might be a proper subject for legislative findings, and what I worry about is that the role of the legislature, the role of the states, are being supplanted by these lawsuits, and the legislative findings are being supplanted by judicial findings, which are installing us as the new enactors of a substantive code of firearms regulation. And the question is, where is all this leaving the political branches of our country, the legislature, the national legislature, the various states? Are they just all being read out of the picture by a series of judicial findings? Do you see what I'm saying? I do, your honor, and I think there's a legislative consensus that has existed for almost a century that these are the kind of firearms, that firearms with obliterated serial numbers should be regulated, so states started enacting that. The legislators, they are elected officials. They are in tune with the needs of the people they represent. They know what their fears are. They know what their feelings are, and they're responsive to those constituent concerns, and isn't it a danger to supplant the input that legislatures through their ears and eyes get through the people in the community? Isn't it a danger of supplanting that whole process with a judicially insulated set of findings? Is that where we're going? Your honor, I would agree that this court shouldn't strike down a congressional statute for constitutional reasons without compelling reasons to do so. The Supreme Court has said that. Again, there is a legislative consensus. The state amicus brief points out that 41 states have these. Congress has determined since 1938 that the firearms with obliterated serial numbers should not be possessed, and although there have been some minor changes to sort of comply with modern commerce clause jurisprudence, that's been Congress's determination since 1938, and that arose in response to the real problem of firearms with obliterated serial numbers being left at crime scenes, similar to the way that Congress responded to machine guns, sawed-off shotguns, etc. Counsel, if we look at Bruin, yeah, Bruin tells us how we look at these sort of regulations, and you started with saying that the common usage would be the easiest way for us to address that, and that seems to be the only easy, depending on who we place the burden of proof. I mean, the debate or the discussion you had with Judge Richardson seems to illustrate that, and a lot of people have said that's an easy question. It's just an unlimited first look at plain text, and other people have said, well, it includes some historical information. It seems like the answer to that question makes a big difference in this case. So, Your Honor, I don't think it does, because despite the issues with our statistics that Judge Richardson has pointed out, there's really nothing pointing in the other direction to suggest that firearms with obliterated, removed, or altered serial numbers are in common use for a lot of them. You've heard of Mark Twain, right? Yes. You've got a quote about your statistics. Yes, Your Honor. So, Judge Qualbaum, if that's a concern for you, that you can't reach a conclusion based on the fact that you know about common use, then again, we think we have good historical analogs for Section 922K. For example, the laws for Massachusetts and Maine in the early 1800s, immediately after the period of the founding, prohibiting the removal of proof marks from firearm gun barrels. Thank you, Mr. Glaser. Thank you. Judge Richardson stole my closing line. I was going to use it. My deep apology, Chief. You owe me one. I want to thank both counsel for their arguments this morning on these very difficult issues. We'll come down and greet counsel and adjourn for the day. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Diaz, Wilkinson, Niemeyer, King, Gregory, Agee, Wynn, Thacker, Harris, Richardson, Quattlebaum, Rushing, Heytens, Benjamin, Berner